IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

S.B., as parent and next friend )
of N.J.B. )
)
v. ) NO. 3-15-0106
) JUDGE CAMPBELL
MURFREESBORO CITY )
SCHOOLS )

MEMORANDUM

This action is an appeal, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, from the Final Order of an Administrative Law Judge ("ALJ") dated December 15, 2014 (Docket No. 20-1). Pending before the Court are Defendant's Motion for Judgment on the Administrative Record (Docket No. 19) and Plaintiff's Motion for Judgment on the Administrative Record (Docket No. 21).

FACTS

N.J.B. ("Plaintiff")[1], a student in the Murfreesboro City Schools ("Defendant"), was referred at the age of 8 [2] to Defendant's Licensed School Psychologist for a "complete evaluation for special education services due to recent events in which [Plaintiff's] behavior has escalated to the point in which it was very difficult to get his emotions under control." AR 612.[3] The evaluation was conducted "to determine if he meets eligibility requirements for special education services." AR 623.

---

[1] Although this action is brought by N.J.B.'s father and next friend, S.B., the Court will refer to N.J.B. as "Plaintiff" for purposes of this Memorandum.

[2] Plaintiff attended preschool, kindergarten and first grade in Defendant's school system, under an IEP each year for behavior issues. AR 350-352. Plaintiff did not have an IEP for second grade. AR 353.

[3] The Administrative Record ("AR"), filed manually at Docket No. 15, will be referenced by the page numbers therein.

The school psychologist stated that Plaintiff "recently began to experience some social/emotional difficulty in the classroom that is having an adverse impact on his educational performance and is related to his medical diagnoses." AR 623. She found that Plaintiff was eligible for special education due to his "medical diagnosis of ADHD and mood disorder." AR 624. She noted that Plaintiff "demonstrates an inability to learn which cannot be explained by intellectual or sensory factors." *Id*.

Defendant developed an Individual Education Program ("IEP"), dated December 12, 2012, for Plaintiff, as required by the IDEA. AR 625-643. The IEP noted that, although Plaintiff was very strong academically, his "health impairment [ADHD and Mood Disorder] interferes with his progress in the general curriculum and makes special programming necessary." AR 626. The IEP also noted that Plaintiff's behavior impeded his learning and that of others. AR 628. The IEP team addressed Plaintiff's behavior with a functional behavior assessment, goals and objectives, a behavior intervention plan, and accommodations. *Id.*

Under the IEP, which Plaintiff's father signed, the annual goal was for Plaintiff to "work to develop control over their (sic) own behaviors." AR 629. The special education service Plaintiff was to receive, at Northside Elementary, related to "Social Behavior," and the provider title was "Resource," which Plaintiff would receive 3 times per week in a regular education setting and 5 times per week in a special education setting. AR 634. All of the goals/objectives in this IEP were behavioral:

> [Plaintiff] will respond calmly to constructive criticism.
> [Plaintiff] will listen attentively during direct instruction.
> [Plaintiff] will follow three-step directions with one prompt.
> [Plaintiff] will comply with adult requests the first time they are given.
> [Plaintiff] will work cooperatively with his peers.

> [Plaintiff] will seek attention in appropriate ways.

AR 629.

> Plaintiff's teacher, Ms. Rotella, testified:
>
>> He does have the ability to do grade-level work, however he cannot focus on instructions, gets distracted easily. He also misses a great deal of instruction because he's in cool down. And then when he's asked to do the work he becomes very frustrated and an outburst follows. Outbursts stop all classroom instructions. He becomes so worked up that he cannot benefit from one-on-one special instructions, special education instruction in the classroom, or during pullout resource time.

AR 1278.

Plaintiff's behavior deteriorated,[4] and in February of 2013, Defendant held another IEP meeting and a new IEP for Plaintiff was signed. AR 922-936. This IEP was basically the same as the December 12, 2012 IEP except Plaintiff's placement changed to full-time special education at Mitchell-Nielson Elementary School.[5] The IEP's annual goal was the same - to work to develop control over his behaviors - but the special education service Plaintiff was to receive was with a full-time special education behavior management teacher in a special education setting, five days per week. AR 932. Again the goals and objectives for Plaintiff were behavioral.

---

[4] Although the Administrative Law Judge ("ALJ") found that Plaintiff was making reasonable educational progress during this time (Final Order, ¶ 7), that progress was *academic* progress, not progress toward his IEP goals, because clearly his behavior did not improve. Later, she stated that Plaintiff made academic progress at Mitchell-Nielson, again despite his failure to meet the IEP goals. Final Order, ¶ 9.

[5] The principal at Mitchell-Nielson testified that she had concerns about Plaintiff's needs being met at Mitchell-Nielson because he would be in a "very fragile classroom" with a "very flexible schedule." AR 1327.

The teacher for Plaintiff's classroom at Mitchell-Nielson, Ms. Herod, attended the IEP meeting in February of 2013, but by the time Plaintiff got to Mitchell-Nielson, she was out on maternity leave. AR 1344 and 1361-63. At the IEP meeting, Herod expressed concern over Plaintiff's placement at Mitchell-Nielson, indicating that the classroom did not run on a set schedule or routine and she was concerned that the situation in her classroom was not the safest for Plaintiff. AR 961 and 1364-65. She noted that Plaintiff's outbursts would interrupt the other students, that the class was individually structured for each child, and that it was not the placement for Plaintiff. *Id*.

Plaintiff's father testified that he signed the February 2013 IEP because he thought Plaintiff clearly needed a special education teacher, what was going on at his current school was not working, he thought this would work, and he was not offered anything else. AR 377.[6] Plaintiff's father agreed that Plaintiff's intelligence is average to high average and, although he has serious behavioral issues, at least from an *academic* viewpoint, his performance is commensurate with his ability.[7] AR 433-34.

The substitute teacher in Plaintiff's classroom at Mitchell-Nielson, Amy Oliver, was not a certified special education teacher, even though Plaintiff's IEP required a special education behavior management teacher. AR 1344 and 932. Plaintiff continued to have serious behavior problems at Mitchell-Nielson. *See, e.g.,* AR 1333-1341.

Dr. Raulston, Plaintiff's child psychiatrist (who first saw Plaintiff in November of 2008 and last saw him in April of 2013), testified that when he last saw Plaintiff, he was having approximately

---

[6] Plaintiff's father testified that he did not think the IEP goals were "wrong." "All I know is that it didn't work." AR 475-76.

[7] Plaintiff's grades at Northside Elementary were As and Bs; Plaintiff's grades at Mitchell-Nielson were As, Bs, and Cs. AR 954, 980-81.

4

three rage episodes[8] per day over mild events and his behavior was gradually worsening over the past four months. AR 1769. These behaviors affected how Plaintiff was doing in school. AR 1771-72.

On April 11, 2013, Plaintiff's father took him out of Mitchell-Nielson. He (father) was concerned that it was unsafe for Plaintiff to be at school since the behavioral measures, even in the behavior classroom, had not reduced the frequency, intensity and duration of Plaintiff's rages.[9] AR 454. As a result of these concerns, Plaintiff's father admitted Plaintiff to Vanderbilt Psychiatric Hospital, where the records reflect that Plaintiff "has become dysregulated to the point that he can no longer safely participate in school and has significant difficulties at home, as well." AR 664. The records from Vanderbilt reflect "educational problems" as part of Plaintiff's Axis IV Diagnosis. *See, e.g.,* AR 995, 1037 and 1045.[10]

From there, Plaintiff's father moved Plaintiff to Laurel Heights Treatment Center in Atlanta. AR 455-56. He notified Defendant that he was dis-enrolling Plaintiff from Murfreesboro City Schools "because Murfreesboro City Schools has (sic) been unable to meet his educational needs this year." AR 1051. On June 5, 2013, Plaintiff's father suggested that Plaintiff's educational needs require a facility that has structure and takes a multi-modal approach, something no public school anywhere could provide. AR 1066.

---

[8] For Dr. Raulston, a "rage episode" is a significant behavioral meltdown - really out of control kind of behavior. AR 1770.

[9] The ALJ found that Plaintiff's academic performance and "presumably" his educational progress had nothing to do with the decision to remove him from Mitchell-Nielson. Final Order, ¶ 18. Again, she failed to mention his IEP goals, which were all behavioral, not academic. Plaintiff's father removed Plaintiff from Mitchell-Nielson because it was not working.

[10] The Treatment Plans at Intermountain similarly reflect "Educational Problems" as part of the Axis IV diagnosis. *See, e.g.,* AR 1096, 1099 and 1226.

On August 1, 2013, Plaintiff's father moved Plaintiff to Intermountain Deaconess Children's Services ("Intermountain") in Helena, Montana.[11] The Education Director at Intermountain testified that Intermountain's education team participates with the therapist and the case manager in the development of a child's Treatment Plan. AR 1643-44. Based on the Treatment Plan, the education team comes up with "Education Strategies," which are techniques or strategies to help reach the goals they establish in the Treatment Plan. AR 1645. The education staff also complete a daily written log to describe how the child progressed on his goals during the education setting each day. *Id*. The education team meets with the therapy team and case manager every Monday to talk about the appropriateness of the child's goals and to talk about how his behaviors were across all environments - in the classroom setting, in the cottages and otherwise during that week. AR 1644-45.[12] All teachers at Intermountain are certified in special education and are all endorsed to teach special education. AR 1646.

The Education Director testified that Plaintiff's behavior gets in the way of his education, even though he is a bright student.[13] AR 1654. The Education Director also testified that Plaintiff needs residential placement to access his education and that he made educational progress and

---

[11] The Placement Agreement between Intermountain and Plaintiff's family states that Plaintiff is being placed there "for the purpose of providing intensive treatment conducive to the healthy growth and development of the child." AR 1091. The parents agreed to pay $385 per day for Plaintiff's treatment, education, and room and board. AR 1092.

[12] Thus, the ALJ's assertion that Plaintiff's Treatment Plan at Intermountain focused primarily on treatment and only minor references were made in regard to Plaintiff's education (Final Order, ¶ 22) is not really accurate.

[13] Plaintiff's Report Card for four quarters at Intermountain reflected grades of As, Bs, Cs, Satisfactories, and Excellents in his academic subjects. AR 1242.

6

received an educational benefit at Intermountain.[14] AR 1663. He testified that Plaintiff's behaviors were progressively getting better at Intermountain. *Id*.

The Chief Clinical Officer at Intermountain, Dr. Kohlstaedt, a licensed psychologist, testified that the child's Treatment Plan guides the integrated treatment of all of Intermountain's services. AR 1374. She stated that it is necessary for Plaintiff's treatment to be integrated so that in all his environments - educationally, in the cottage, with peers, in the lunchroom, with parents - treatment is consistent and collaborative and communicated across environments so that the maximum effect can take place. AR 1375. She stated that the problem with a complex child like Plaintiff is that treatment of an individual part of his issues without incorporating all of the relationships that are significant will not help him get better. The treatment for one thing - like medical treatment at Vanderbilt or behavioral treatments in school - is fine, but if you only treat a piece of the problem, it is not enough - you cannot treat one in isolation. AR 1392-93. She testified that Plaintiff's Treatment Plan is integrated, meaning that he is working on the same goals and objectives with slightly different strategies in the classroom as he is in his cottage, as he is in therapy. AR 1399. "So there's one treatment plan that says this is what we believe is what [Plaintiff] needs to get better and that that is worked on in every environment differently." *Id*. She explained that Plaintiff has struggled in all environments (at home, with peers, in the classroom, with parents, in the lunchroom). AR 1401.

Plaintiff's Initial Treatment Plan at Intermountain states that his Reason for Admission is because he "has struggled to have healthy relationships with both adults and peers. [He] has been

---

[14] The Education Director measured Plaintiff's progress based on his Treatment Plan, which includes education. AR 1664.

physically and verbally aggressive and threatening to the point that he has been unable to maintain in a family and community setting." AR 1096. The Treatment Plan provides for two objectives, both of which include Education Strategies. AR 1096-97. For example, the Education Strategies for Objective 1 (Plaintiff will begin to accept adult care as evidenced by tolerating adult closeness) include "Education Staff will help [Plaintiff] learn and understand the classroom structure and routines" and "Education Staff will physically contain [Plaintiff] when he is a harm to himself or others." AR 1096. Subsequent Treatment Plans at Intermountain also included Education Strategies. *See, e.g.,* AR 1100-01, 1106-07, 1174-75 and 1227-29. Some of Plaintiff's Treatment Plans at Intermountain also provide an Educational Summary, which includes a description of Plaintiff's behavior and his progress in the classroom setting. *See e.g.,* AR 1102, 1156, 1166 and 1230-31.

Plaintiff's teacher for fourth grade at Intermountain, Jarrod Murgel, testified that Intermountain's educational staff marked Plaintiff's educational progress at the end of every school day, indicating Plaintiff's progress toward meeting education goals. AR 304-05. That information is used in the Treatment Plan review every three months. AR 305. Murgel described Plaintiff as "a very intelligent young man when he's not emotionally overwhelmed." AR 313. He stated that when Plaintiff is emotionally overwhelmed, it is very difficult for him to concentrate while he is in the classroom setting, but when he is emotionally stable he does well academically and he has made progress academically at Intermountain. *Id.*[15]

The March 10, 2014 Psychological Assessment Report of Intermountain's Chief Clinical Officer, Dr. Kohlstaedt, indicates that Plaintiff's difficulties in school are not due to his cognitive

---

[15] "[T]he big piece for him is not the academic piece, it's that emotional piece for him." AR 318.

abilities, but they are secondary to emotional disturbance which makes him exquisitely sensitive to rejection from valued others. AR 1184. "Treating the medical, emotional, psychological and educational components separately has been ineffective, and will continue to be so, since his emotional disturbance bridges all of those arenas." *Id.*[16] She stated that residential treatment continues to be indicated to provide interpersonal interventions that are consistent in all environments. AR 1186.

Defendant denied Plaintiff's request for reimbursement for Intermountain, and the dispute was heard by an ALJ to determine whether Defendant violated the IDEA and whether Plaintiff was entitled to relief. After a three-day hearing, the ALJ ruled that Defendant did provide Plaintiff a free, appropriate education in compliance with the IDEA and Plaintiff was not entitled to any relief. This action is an appeal from that decision.[17]

ANALYSIS

The IDEA was enacted to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A). In general, the IDEA aims to ensure that every child has a meaningful opportunity to benefit from public education. *Holman v. District of Columbia*, __ F. Supp. 3d __, 2016 WL 355066 at * 1 (D.D.C. Jan. 28, 2016).

---

[16] Dr. Kohlstaedt also stated that Plaintiff needs a consistent environment that can calm the emotional storms and help him regulate, from a more neutral place, the "dance of intimacy" in all environments. AR 1184.

[17] The Final Order of the ALJ contains no cites to the record or the transcript of the hearing, so it is unclear to the Court upon what evidence she relied for each finding.

Under the IDEA, parents who consider their child's placement and/or IEP inappropriate have a right to an impartial due process hearing by a state or local educational agency. 20 U.S.C. § 1415(f) and (g). Any party aggrieved by the findings and decision at the due process hearing shall have the right to bring a civil action for review of that decision. 20 U.S.C. § 1415(i)(2). The party attacking the appropriateness of the IEP established by the local educational agency bears the burden of showing why the IEP and resulting placements were inappropriate under the IDEA. *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000).

When a party files an action challenging an administrative decision under the IDEA, a district court shall (1) receive the records of the administrative proceedings; (2) hear additional evidence at the request of a party; and (3) grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(C). In order to determine whether the IDEA has been violated, a district court applies a modified *de novo* standard of review. *H.M. v. Weakley County Bd. of Educ.*, 2015 WL 1179615 at * 10 (W.D. Tenn. March 13, 2015). Under this standard, the court may not simply adopt the state administrative findings without an independent re-examination of the evidence; nor may it substitute its own notions of sound educational policy for those of the school authorities. *Id*.

The court may set aside the administrative findings only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise,[18] a fair estimate of the worth of the testimony, or both. *N.W. v. Boone County Bd. of Educ.*, 763 F.3d 611, 614 (6th Cir. 2014). Less weight is due to an

---

[18] There is no evidence before the Court that this particular ALJ had any educational expertise or was an educator.

agency's determination on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. *Id.*

Where, as here, the parents unilaterally change their child's placement without the consent of state or local school officials, they do so at their own financial risk. *Berger v. Medina City School Dist.,* 348 F.3d 513, 519 (6th Cir. 2003). In that situation, the parents are entitled to reimbursement only if a federal court concludes both that (1) the public placement violated the IDEA and (2) the private school placement was proper under the Act. *Id.* at 519-20.

In determining whether the public placement violated the IDEA, the reviewing court must undertake a twofold inquiry: whether the school system complied with the procedures set forth in the IDEA and whether the IEP developed is reasonably calculated to enable the child to receive educational benefits. *Berger*, 348 F.3d at 520 *(*citing *Bd. of Educ. of Henrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)). There appears to be no dispute that the Defendant here complied with the procedures set forth in the IDEA. The first issue, therefore, is whether the February 2013 IEP developed for Plaintiff was reasonably calculated to enable him to receive educational benefits. Not surprisingly, Plaintiff argues it was not and Defendant argues that it was.

The Court finds that the February 2013 IEP developed for Plaintiff was not reasonably calculated or implemented to enable him to receive educational benefits. The IEP moving Plaintiff to Mitchell-Nielson was the same as the IEP that was obviously not working at Northside Elementary, except for the placement. According to the IEP, Plaintiff was supposed to be moved into a special education setting full-time, with the requirement of a full-time special education

behavior management teacher. The actual teacher in Plaintiff's class, however, was not a special education teacher at all. She was not certified to teach special education.[19]

It is difficult for the Court to see how the ALJ found that Defendant complied with Plaintiff's IEPs, implemented Plaintiff's IEPs, and provided the services that were outlined in Plaintiff's IEPs (Final Order, pp. 8 and 9), when Defendant did not provide full-time special education with a special education behavior management teacher.

The Supreme Court has described the IEP as the primary vehicle for implementing the congressional goals identified in the IDEA. It follows that a school district's adherence to the prescribed IEP is essential to a child's educational development under the IDEA. *Holman,* 2016 WL 355066 at * 4. The IDEA is violated when a school district materially deviates from a student's IEP. *Id*. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP. *Id.; Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007); *see also Seth B. ex rel. Donald B. v. Orleans Parish School Bd.*, 810 F.3d 961, 978, n. 67 (5th Cir. 2016). As the Eighth Circuit Court of Appeals has noted: "we cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit." *Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1027, n.3 (8th Cir. 2003).

The failure to provide a special education teacher for Plaintiff is not a *de minimus* failure to implement the provisions of his IEP. Defendant failed to implement the only change to Plaintiff's

---

[19] The principal at Mitchell-Nielson testified that she was concerned about the regular special education teacher not being there and was concerned that her school was not a proper placement for Plaintiff.

12

earlier IEP, placement in a setting with full-time special education, with a full-time special education behavior management teacher. The IDEA requires that as soon as possible following development of an IEP, special education and related services are made available to the child in accordance with the IEP. *Holman* at * 1. The appropriate special education and related services at Mitchell-Nielson were never made available to Plaintiff in accordance with his IEP. That is a material failure.[20]

As noted earlier, Plaintiff is entitled to a "free appropriate public education" that emphasizes special education and related services designed to meet his unique needs and prepare him for further education, employment, and independent living. "Special education" is defined to mean "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). "Related services" include psychological services, social work services, and counseling services as may be required to assist the child with a disability to benefit from special education. 20 U.S.C. § 1401(26).

Defendant determined that Plaintiff was eligible for special education. Therefore, he was entitled to instruction designed to meet *his unique needs*, which were emotional and behavioral, at no cost to the parents. He was also entitled to related services, including psychological services, social work services, and counseling services as might be required to assist him to benefit from special education. Given what Defendant knew and what was actually implemented (or not) at Mitchell-Nielson, the IEP of February 2013 was not reasonably calculated or implemented to enable Plaintiff to receive educational benefits. In addition, there is no evidence that Plaintiff made any progress at Mitchell-Nielson toward his IEP goals, which were behavioral, not academic.

---

[20] The materiality standard does not require that the child suffer demonstrable educational harm. *Holman* at * 5.

The Court is aware that the IDEA does not require the furnishing of every special service necessary to maximize each child's potential. *Rowley*, 458 U.S. at 199. Once a school district determines that a child is eligible for special education and related services, however, those special education and related services, designed to meet that child's unique needs, must be provided. Here, they were not.

Having found that the public placement and Plaintiff's IEP, as implemented, violated the IDEA, the Court must now determine whether the residential placement at Intermountain was appropriate. Parents are entitled to reimbursement for private school placement so long as the placement was reasonably calculated to provide educational benefits. *Knable v. Bexley City School Dist.*, 238 F.3d 755, 771 (6th Cir. 2001) (citing *Florence County School Dist. Four v. Carter*, 114 S.Ct. 361 (1993)). As the Court stated in *Florence County:*

> There is no doubt that Congress imposed a significant financial burden on States and school districts that participate in the IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is the IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Florence County*, 114 S.Ct. at 366.

Defendant argues that Plaintiff's placement at Intermountain was primarily for treatment, not for education, citing, among other things, *Kings Local School Dist. v. Zelazny*, 325 F.3d 724 (6th Cir. 2003). In *Kings Local*, the court stated that to assess whether a residential placement is appropriate, the court must determine whether full time residential placement is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning

process. *Id*. at 730. Plaintiff here has shown, however, that his educational difficulties are not separable from his emotional and behavioral problems.

As noted above, the reason Plaintiff was placed into special education in the first place, at Northside Elementary, was because of his emotional and behavioral problems. All the goals and objectives of his IEPs with Defendant were behavioral. Plaintiff has presented evidence that his emotional and behavioral problems are *not* separate from the learning process. Numerous witnesses testified about and exhibits explained Plaintiff's need for consistency across all his environments and the integrated nature of the Intermountain program. Treating the medical, emotional, psychological and educational components separately was ineffective.[21] The Court finds that Plaintiff's residential placement was needed for Plaintiff to benefit from special education.

The definition of special education specifically includes instruction conducted in hospitals, institutions, and other settings. 20 U.S.C. § 1401(29); *see also Babb v. Knox County School System*, 965 F.2d 104, 108-09 (6th Cir. 1992). Another case cited by Defendant, *Munir v. Pottsville Area School Dist.*, 723 F.3d 423 (3d Cir. 2013),[22] specifically recognizes that residential placement may be necessary when the disabled child needs a highly structured environment in order to obtain any kind of educational benefit. *Id*. at 431. Plaintiff needs consistency of programming and environment to meet his educational goals because of his emotional and behavioral problems. Plaintiff's IEP goal,

---

[21] As Plaintiff's psychologist testified, Plaintiff is Plaintiff 24 hours a day. He does not leave a part of him at the door if he goes to a friend's house or at the door of his parents' house or at the door of the school. AR 1760.

[22] In *Munir*, the student's residential placement was prompted by a medical emergency and the court found that the services provided were more medical than educational. *Munir*, 723 F.3d at 433 (finding that the child received only an incidental educational benefit).

15

as developed by Defendant, was to work to develop control over his own behaviors. The Court finds that residential placement is necessary for Plaintiff to make progress toward this goal.[23]

Defendant also contends that Intermountain cannot be an "appropriate" placement under the IDEA because there is nothing in the records evidencing that it has been approved by the state as a school. The U.S. Supreme Court has held, however, that a court may award reimbursement for parents who unilaterally withdraw their child from a public school that provides an inappropriate education under the IDEA and put the child in a private school that provides an education that is otherwise proper under the IDEA, even if it does not meet all of the Act's requirements of the definition of a "free, appropriate, public education." *Florence County*, 114 S.Ct. at 365. In addition, the Court held that reimbursement is not necessarily barred by a private school's failure to meet state education standards. *Id*. The parents' failure to select a program known to be approved by the State in favor of an unapproved option is not itself a bar to reimbursement. *Id*. at 366. Thus, the state approvals Defendant argues are not required in order for Plaintiff to be reimbursed under the IDEA. *See also Lauren W. v. Deflaminis*, 480 F.3d 259, 276-77 (3d Cir. 2007).

Moreover, the inclusion of Plaintiff's educational goals and objectives in his Treatment Plan, rather than an IEP, is not fatal to Plaintiff's claim. *Florence County*, 114 S.Ct. at 365. An appropriate private placement need not provide certified special education teachers (which Intermountain does provide) or an IEP for the disabled student. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). Although the private placement need not furnish every special service necessary

---

[23] The Ninth Circuit case cited by the ALJ involved a student who was transferred to a residential facility to treat medical, not educational problems. The court there recognized that reimbursement was not appropriate where a placement to necessary medical, social or emotional problems quite apart from the learning process. *Ashland School Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1185 (9th Cir. 2009).

to maximize the child's potential, the placement must provide children with "meaningful access" to education. *Id*. at 364-65. Plaintiff has shown that this private school placement was reasonably calculated to provide meaningful access to education.

Here, the record indicates that Intermountain has a state license as a residential facility which allows it to house children safely, to treat them with licensed clinicians, *special ed certified teachers*, and appropriate levels of direct care to child ratios. AR 1371. The License itself states that Intermountain's classification is "Mental Health Center - Child & Adolescent Case Management, Child & Adolescent Day Treatment, *Comprehensive School* & Community Treatement (sic) Program (CSCT)." AR 1735 (emphasis added). The Court finds that Plaintiff's residential placement at Intermountain makes available to him special education and related services designed to meet his unique needs and prepare him for further education, employment, and independent living, which is one of the purposes of the IDEA. 29 U.S.C. § 1400(d)(1)(A).[24]

For all these reasons, the Court finds that Defendant failed to implement an appropriate IEP for Plaintiff, in violation of the IDEA, and Plaintiff's placement at Intermountain is appropriate. Therefore, the ruling of the ALJ is reversed, and Plaintiff is entitled to reimbursement for his private placement expenses.[25]

IT IS SO ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

---

[24] In light of this ruling, it is unnecessary for the Court to deal with Plaintiff's identified issues numbers 7 and 8 (Docket No. 23, pp. 4-5).

[25] In fashioning a remedy in this case, the Court is mindful of equitable considerations, which are relevant under *School Committee of Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 105 S.Ct. 1996, 2005 (1985), as noted in *Knable*, 238 F.3d at 771.